# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK

JENNIFER LYNN J.,

                              Plaintiff,

    v.

                                     3:20-CV-1294

KILOLO KIJAKAZI, COMMISSIONER       (ATB)
OF SOCIAL SECURITY,

                              Defendant.

PETER A. GORTON, ESQ., for Plaintiff
MOLLY CARTER, Special Asst. U.S. Attorney, for Defendant

ANDREW T. BAXTER
United States Magistrate Judge

## MEMORANDUM-DECISION AND ORDER

This matter was referred to me, for all proceedings and entry of a final judgment, pursuant to the Social Security Pilot Program, N.D.N.Y. General Order No. 18, and in accordance with the provisions of 28 U.S.C. § 636(c), Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 73.1 and the consent of the parties. (Dkt. Nos. 4, 7).

## I.    PROCEDURAL HISTORY

On February 26, 2018, plaintiff protectively filed an application for a period of disability and disability insurance benefits ("DIB"), alleging that she became disabled on February 7, 2017. (Administrative Transcript ("T.") 109, 196-202). Her application was denied initially on June 12, 2018. (T. 124-29). Plaintiff requested a hearing, which was held by video conference on October 7, 2019 before Administrative Law Judge ("ALJ") Paul D. Barker, Jr. (T. 60-108). Plaintiff and Vocational Expert ("VE") Richard Riedl testified at the hearing. (*Id.*) ALJ Barker issued an unfavorable decision on November 20, 2019, which became the Commissioner's final decision when the

Appeals Council denied plaintiff's request for review on August 24, 2020. (T. 1-5 (AC Denial), 15-26 (Hearing Decision)).

## II.    GENERALLY APPLICABLE LAW

### A. Disability Standard

To be considered disabled, a plaintiff seeking disability insurance benefits or SSI disability benefits must establish that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months . . . ." 42 U.S.C. § 1382c(a)(3)(A). In addition, the plaintiff's

> physical or mental impairment or impairments [must be] of such  severity that [she] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which [she] lives, or whether a specific job vacancy exists for [her], or whether [she] would be hired if [she] applied for work

42 U.S.C. § 1382(a)(3)(B).  The Commissioner uses a five-step process, set forth in 20 C.F.R. sections 404.1520 and 416.920, to evaluate disability insurance and SSI disability claims.

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If [she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits [her] physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which meets or equals the criteria of an impairment listed in Appendix 1 of the regulations. If the claimant has such an impairment, the

2

[Commissioner] will consider [her] disabled without considering vocational factors such as age, education, and work experience … Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, [she] has the residual functional capacity to perform [her] past work. Finally, if the claimant is unable to perform [her] past work, the [Commissioner] then determines whether there is other work which the claimant can perform.

*Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982); *see* 20 C.F.R. §§ 404.1520, 416.920. The plaintiff has the burden of establishing disability at the first four steps. However, if the plaintiff establishes that her impairment prevents her from performing her past work, the burden then shifts to the Commissioner to prove the final step. *Id.*

**B. Scope of Review**

In reviewing a final decision of the Commissioner, a court must determine whether the correct legal standards were applied and whether substantial evidence supported the decision. *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013); *Brault v. Soc. Sec. Admin. Comm'r,* 683 F.3d 443, 448 (2d Cir. 2012); 42 U.S.C. § 405(g). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012). It must be "more than a scintilla" of evidence scattered throughout the administrative record. *Id.* However, this standard is a very deferential standard of review, "even more so than the 'clearly erroneous standard.'" *Brault,* 683 F.3d at 448.

"To determine on appeal whether an ALJ's findings are supported by substantial evidence, a reviewing court considers the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams on behalf of Williams v. Bowen*, 859 F.2d

255, 258 (2d Cir. 1988). However, a reviewing court may not substitute its interpretation of the administrative record for that of the Commissioner, if the record contains substantial support for the ALJ's decision. *Id. See also Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982).

An ALJ is not required to explicitly analyze every piece of conflicting evidence in the record. *See, e.g., Monguer v. Heckler*, 722 F.2d 1033, 1040 (2d Cir. 1983); *Miles v. Harris*, 645 F.2d 122, 124 (2d Cir. 1981) (Finding we are unwilling to require an ALJ explicitly to reconcile every conflicting shred of medical testimony). However, the ALJ cannot "pick and choose evidence in the record that supports his conclusions." *Cruz v. Barnhart*, 343 F. Supp. 2d 218, 224 (S.D.N.Y. 2004); *Fuller v. Astrue*, No. 09-CV-6279, 2010 WL 5072112 (W.D.N.Y. Dec. 6, 2010).

## III.  <u>FACTS</u>

Plaintiff was born on January 21, 1994 and was 23 years old on the alleged date of onset. (T. 109).  Plaintiff lived with her husband and two dogs. (T. 63, 78, 87-88).  Plaintiff testified that she completed "some" college. (T. 64).  She had prior work experience stocking grocery shelves, and later as a "beer coordinator" for Wegman's supermarkets. (T. 65-66, 68).  The beer coordinator position involved many responsibilities, including managing the beer vendors, handling the merchandising, organizing beer tastings, writing reports, participating in meetings, and interacting with customers. (T. 65-66).  Plaintiff stated that she was the "face of the department." (T. 66).  Plaintiff estimated that she would have to lift up to 40 pounds. (T. 66).  Plaintiff left the Wegman's job because she could no longer perform the work due to her

gastrointestinal impairment. (T. 67).  Plaintiff testified that she went out on sick-leave in January of 2017 to attempt to diagnose her medical condition. (T. 66).  After undergoing some tests, she went back to work.[1] (T. 66-67).  However, after a short period of time, Wegman's informed her that the company could not allow her to disrupt the other employees with her frequent trips to the bathroom and her inability to maintain a regular work schedule. (T. 67).  The company put plaintiff on short-term disability, but let her go when she could not come back to work. (T. 67-68).

Prior to working for Wegman's, plaintiff worked as a "dietary aide" in a retirement home. (T. 69).  As a dietary aide, her duties included setting up the dining room for meals, serving meals, cleaning up, and making sure that the dishes were washed. (T. 69-70).  Plaintiff testified that she left her job as a dietary aide because her "anxiety and stuff" . . . got to "be a little too much," and she needed "a better environment to grow." (T. 70).

Plaintiff has gastroparesis, which slows down the rate of gastric emptying. (T. 73).  Plaintiff testified that her impairment made it difficult to do everyday things. (T. 70).  Her husband took care of the cleaning and the housekeeping. (*Id.*)  Any pressure exerted on plaintiff's abdomen caused her to feel nauseated and have chronic "borborigmi,"[2] which then caused burping. (T. 70-71).  Plaintiff testified that she could not eat enough food to maintain her strength, and she got weak very quickly. (T. 71).

---

[1] Plaintiff stated that she was initially misdiagnosed with irritable bowel syndrome ("IBS") and sent back to work on a high-fiber diet. (T. 67).

[2] Borborygmus (plural - borborygmi) is defined as intestinal rumbling caused by moving gas. https://www.merriam-webster.com/dictionary/borborygmus.

Plaintiff became weak doing the simplest of tasks, and generally was only able to do household chores for five minutes before she had to rest. (*Id.*)

She often became constipated, which caused her stomach to become bloated and distended so that any slight movement caused her stabbing pain. (T. 72).  She took so many laxatives for her constipation, that when the laxatives finally took effect, she experienced strong, uncontrollable abdominal cramps, causing an urgent need to use the bathroom. (*Id.*)  Plaintiff stated that there were no medications that specifically treated gastroparesis. (T. 73).  She had taken four different medications to increase her intestinal motility, but she had severe adverse reactions to all of them. (T. 73).  Plaintiff testified that she saw her doctors regularly, and she was attending counseling sessions to address the affect of anxiety and stress on her intestinal issues. (T. 74).  She stated that her medical providers were still trying to determine the appropriate treatment. (*Id.*)

Plaintiff testified that she was also using medical marijuana for her condition and to increase her appetite. (T. 75).  She began using it in 2017, shortly after she was diagnosed with gastroparesis. (*Id.*)  Due to her symptoms, she stated that she used the marijuana "every other day, if not daily,"[3] even though she tried to use it only when she needed it. (*Id.*)  Plaintiff also testified that she suffered from Ehlers-Danlos Syndrome ("EDS"),[4] a connective tissue disorder that caused pain in her joints. (T. 72-73).  Plaintiff testified that she has frequent doctors' appointments and attends weekly

---

[3] When she did use the marijuana, she used it four times per day. (T. 76).  Plaintiff testified that it came in oil-form, which she placed into a vaporizer. (*Id.*)

[4] Ehlers-Danlos syndrome is a group of inherited disorders that affects the connective tissues, primarily the skin, joints and blood vessel walls. https://www.mayoclinic.org/diseases-conditions/ehlers-danlos-syndrome/symptoms-causes/syc-20362125.

counseling sessions to help her manage her anxiety and stress. (T. 74).

Plaintiff testified that she got up in the morning and went to the bathroom. (T. 77).  She stated that if the laxatives had "kicked in," she could be in the bathroom for 45 minutes, and then, she would be in and out of the bathroom for the rest of the day. (*Id.*)  Plaintiff then went downstairs to make herself a shake for breakfast.  She testified that some mornings, she did not have the energy to make herself a shake and depended upon her husband for help if he was home. (*Id.*)  Plaintiff testified that the task of making breakfast could take her two hours because if she moved too quickly, it could cause a vomiting episode.[5] (*Id.*)

After plaintiff finished breakfast, she tried to feed her two dogs. (T. 78).  Plaintiff testified that she took a shower in the afternoon, and the hot water helped her severe cramps "seem better." (T. 80).  Plaintiff had to rest in the bedroom for an hour after her shower because the movement made her tired.[6] (*Id.*)  After resting, plaintiff got dressed, and by that time, her husband came home,[7] took care of the dogs, saw to making his own dinner, and assisted plaintiff in preparing her dinner.[8] (T. 80-81).  Plaintiff and her husband then watched a little television and got ready for bed. (T. 81-82).

Plaintiff testified that she had vomiting episodes about three times per week, but

---

[5] Plaintiff later testified that it took her so long because she had to drink the shake very slowly, and she got bloated and nauseated immediately.  She had to sit and rest on the couch, before and after eating. (T. 77-79).

[6] Later, plaintiff testified that she spent a two to three hours napping during the day. (T. 83).

[7] Plaintiff's husband was a public high school teacher. (T. 97).

[8] Because of plaintiff's intestinal issues, she was unable to eat the same food as her husband.  Thus, plaintiff ate mashed or pureed vegetables that were prepared for her over the weekend. (T. 81).

had abdominal pain every day. (T. 82).  Plaintiff stated that the pain was generally in her abdomen, but because of the EDS, she also had pain in her joints.[9] (T. 83).  Some days, if plaintiff was successful in moving her bowels, she had less stabbing pain in her abdomen, but she also suffered from gastritis, which caused a burning sensation throughout her digestive tract. (T. 85-86).  She testified that on "bathroom days," when she was successful in moving her bowels, she was in the bathroom every hour. (T. 87). Plaintiff testified that she often woke up during the night because,[10] if she rolled over, she became nauseated, particularly if she rolled onto her stomach. (T. 89).  Plaintiff also testified that hormones affected her condition, and the pain was worse during certain times in her menstrual cycle because she was also bothered by severe menstrual cramps. (T. 94).  During those times, plaintiff spent the entire day in bed.[11] (T. 95).

The ALJ then questioned the VE. (T. 98-106).  The VE detailed the requirements of plaintiff's prior work experience: beer coordinator/merchandise displayer, shelf stocker, and dietary aid. (T. 99).  Each of plaintiff's former jobs were medium in exertional level, the shelf stocker and the dietary aide were both unskilled jobs, and the beer coordinator/merchandise displayer was between semi-skilled and skilled work. (T. 98-99).

The ALJ's first hypothetical question, assumed a person of plaintiff's age, education, and work experience with the following restrictions: limited to light work;

---

[9] She stated that she had "common" issues with her hips and knees, and that she had headaches frequently due to dehydration and malnutrition. (T. 83).

[10] She specified that she woke up approximately five times during the night. (T. 90).

[11] Plaintiff testified that this could occur five to seven days per month. (T. 95).

could frequently stoop, climb ramps and stairs, balance, kneel, crawl, and crouch; but could never climb ladders, ropes, or scaffolds. (T. 99-100).  Mentally, the individual could understand, remember, and carry out simple tasks, but not at "an assembly line rate;" could make simple work-related decisions; could have occasional work-related interaction with co-workers, supervisors, and the general public; and could have occasional changes in the work setting. (T. 100).  The person would also need ready access to a bathroom. (*Id.*)

The VE testified that such an individual could not perform plaintiff's previous work, but she could perform other work in the national economy, including a housekeeping cleaner, office helper, and a production inspector. (T. 101).  The VE testified that the full range of jobs in each category was not reduced based on any of the additional limitations expressed by the ALJ. (T. 102).

In the ALJ's second hypothetical question, he added a "sit-stand" option–the limitation that the individual would have to sit at her work station for ten minutes after thirty minutes of standing or walking. (T. 102).  The VE testified that, with this additional restriction, the housekeeping cleaner job would be eliminated. (T. 103).  However, while the number of jobs in each of the other two categories would be somewhat reduced based on the additional restriction, the remaining number would still be sufficient for plaintiff to be able to perform the work. (T. 103).

The ALJ's third hypothetical changed the exertional level to sedentary, but retained the additional restrictions discussed above, including the need to have ready access to a bathroom. (T. 103-104).  The ten minute rest restriction was removed. (*Id.*)

9

The VE listed the jobs of production sorter, production inspector, and addresser, with no reduction for any of the additional physical or mental limitations. (T. 104-105). The ALJ then asked whether an of the jobs mentioned would be available if the individual would be "off-task" for up to 20% during the work day. (T. 105). The VE testified that the term "off-task" was only "an opinion," and it was "very difficult to quantify." (T. 105). However, particularly for unskilled work, one could not be off-task for more than 10% of the workday, outside of regular breaks. (*Id.*) The VE then stated that for unskilled work, regular breaks would be allowed after two hours of work. (T. 106). Thus, there would be a 15 minute break mid-morning and mid-afternoon, with a one half hour lunch break in between. (*Id.*) The VE then stated that he would "add" that "most of us over the course of an eight-hour work day, might require one, two, even three short term . . . bathroom breaks for a couple of minutes." (*Id.*)

There is a substantial amount of medical evidence in the administrative record. Rather than reciting the evidence at the outset, I will discuss the relevant materials in my analysis of plaintiff's claims.[12]

## IV.   **THE ALJ'S DECISION**

At step one of the sequential evaluation, the ALJ found that plaintiff met her insured status requirements through September 30, 2022. (T. 17). Plaintiff had not

---

[12] Plaintiff submitted several medical reports to the Appeals Council after the ALJ's decision. (T. 31-56) (Submission by letter dated January 17, 2020). The Appeals Council considered the additional evidence, but found that it did not show a reasonable probability that it would have changed the outcome of the ALJ's decision. (T. 2). Although the evidence is part of the record, the Appeals Council did not give it an "exhibit" number. (T. 2). Plaintiff does not argue that the Appeals Council decision was error. Because the additional evidence is part of the record, this court has reviewed it, but agrees with the Appeals Council that the evidence submitted by plaintiff post-ALJ's decision would not have changed the outcome of plaintiff's case.

engaged in substantial gainful employment since her onset date of February 7, 2017.
(*Id.*)  The ALJ found that plaintiff had the following severe impairments at step two:
gastroparesis, bipolar disorder, depression, anxiety, and substance abuse disorder. (T.
17-18).  At step three, the ALJ found that plaintiff did not have a Listed Impairment. (T.
18-19).  In making this determination, the ALJ considered Listing 5.06 (inflammatory
bowel disease) and 12.04 (depression and bipolar-related disorders). 20 C.F.R. Pt. 404,
Subpt. P, App. 1 §§ 5.06, 12.04.

At step four, the ALJ found that plaintiff had the RFC to perform light work,
with the ability to lift 20 pounds occasionally and 10 pounds frequently. (T. 19).  In
addition, plaintiff could stand and walk 30 minutes at a time, for six hours of an eight-
hour work day, with the option to sit at the work station for 10 minutes after 30 minutes
of standing or walking. (*Id.*)  She could sit for six hours of an eight-hour work day, and
she could frequently stoop, climb ramps and stairs, balance, kneel, crawl, and crouch.
She could never climb ladders, ropes, or scaffolds. (*Id.*)  Mentally, she could
understand, remember, and carry out simple tasks, but not at an assembly line rate;
could make simple work-related decisions; could have occasional related interactions
with co-workers, supervisors, and the general public; and could have occasional
changes in the work setting. (*Id.*)  She needed to have ready access to a bathroom at the
work site. (*Id.*)

In making this determination, the ALJ considered the medical evidence and
medical opinions, together with the plaintiff's symptoms and hearing testimony. (T. 19-
24).  The ALJ discussed the medical opinions and Medical Source Statements ("MSS")

of record. (*Id.*)  Based on the above RFC, the ALJ determined that plaintiff could not perform any of her past medium work. (T. 24-25).  However, based on the VE's testimony and considering the plaintiff's age, education, prior work experience and RFC, the ALJ found that plaintiff could perform jobs which existed in significant numbers in the national economy. (T. 25-26).  The ALJ cited the specific jobs of office helper and production sorter. (T. 26).  Thus, the ALJ found that plaintiff was not disabled for purposes of Social Security.

## V.   ISSUES IN CONTENTION

Plaintiff raises the following arguments in support of her position that the ALJ's decision is not supported by substantial evidence:

1.   The ALJ failed to assess any limitations as to work pace and/or attendance. (Pl.'s Br. at 11-21) (Dkt. No. 13).

2.   The ALJ improperly assessed the medical opinions. (Pl.'s Br. at 21-23).

Defendant argues that the Commissioner's decision is supported by substantial evidence. (Def.'s Br. at 3-23) (Dkt. No. 19).  Plaintiff has filed a reply brief. (Dkt. No. 22).  For the following reasons, this court agrees with the defendant and will affirm the Commissioner's decision and dismiss the complaint.

## VI.   RFC/Weight of the Evidence

### A.   Legal Standards

#### 1.   RFC

RFC is "what [the] individual can still do despite his or her limitations. Ordinarily, RFC is the individual's maximum remaining ability to do sustained work activities in an ordinary work setting on a regular and continuing basis. . . ."  A "regular

and continuing basis" means eight hours a day, for five days a week, or an equivalent work schedule. *Balles v. Astrue*, No. 3:11-CV-1386 (MAD), 2013 WL 252970, at *2 (N.D.N.Y. Jan. 23, 2013) (citing *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999) (quoting SSR 96–8p, 1996 WL 374184, at *2)); *Babcock v. Berryhill,* No. 5:17-CV-00580 (BKS), 2018 WL 4347795, at *12-13 (N.D.N.Y. Sept. 12, 2018); *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33 (2d Cir. 2013); *Stephens v. Colvin*, 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016).

In rendering an RFC determination, the ALJ must consider objective medical facts, diagnoses, and medical opinions based on such facts, as well as a plaintiff's subjective symptoms, including pain and descriptions of other limitations.  20 C.F.R. §§ 404.1545, 416.945.  *See Martone v. Apfel*, 70 F. Supp. 2d 145, 150 (N.D.N.Y. 1999) (citing *LaPorta v. Bowen*, 737 F. Supp. 180, 183 (N.D.N.Y. 1990)); *Kirah D. v. Berryhill*, No. 3:18-CV-0110 (CFH), 2019 WL 587459, at *8 (N.D.N.Y. Feb 13, 2019); *Genier v. Astrue,* 606 F.3d 46, 49 (2d Cir. 2010).  An ALJ must specify the functions plaintiff is capable of performing, and may not simply make conclusory statements regarding a plaintiff's capacities.  *Roat v. Barnhart,* 717 F. Supp. 2d 241, 267 (N.D.N.Y. 2010); *Martone v. Apfel*, 70 F. Supp. 2d at 150 (citing *Ferraris v. Heckler*, 728 F.2d 582, 588 (2d Cir. 1984); *LaPorta v. Bowen*, 737 F. Supp. at 183, *Stephens v. Colvin,* 200 F. Supp. 3d 349, 361 (N.D.N.Y. 2016); *Whittaker v. Comm'r of Soc. Sec.*, 307 F. Supp. 2d 430, 440 (N.D.N.Y. 2004).  The RFC assessment must also include a narrative discussion, describing how the evidence supports the ALJ's conclusions, citing specific medical facts, and non-medical evidence.  *Natashia R. v. Berryhill*, No.

3:17-CV-01266 (TWD), 2019 WL 1260049, at *11 (N.D.N.Y. Mar. 19, 2019) (citing SSR 96-8p, 1996 WL 374184, at *7).

### 2.    Weight of the Evidence

In making a disability determination, the ALJ weighs all the evidence of record and carefully considers medical source opinions about any issue. SSR 96-5p, 1996 WL 374183, at *2-3 (1996).  Under 20 C.F.R. §§ 404.1527(e) and 416.927(e), some issues are not "medical issues," but are "administrative findings."  The responsibility for determining these issues belongs to the Commissioner.  *See* SSR 96-5p, 1996 WL 374183, at *2.  These issues include whether the plaintiff's impairments meet or equal a listed impairment; the plaintiff's RFC; how the vocational factors apply; and whether the plaintiff is "disabled" under the Act. *Id.*

In evaluating medical opinions on issues that are reserved to the Commissioner, the ALJ must apply the factors listed in 20 C.F.R. §§ 404.1527(d) and 416.927(d).  The ALJ must clearly state the legal rules that he applies and the weight that he or she accords the evidence considered.  *Drysdale v. Colvin*, No. 14-CV-722, 2015 WL 3776382, at *2 (S.D.N.Y. June 16, 2015) (citing *Rivera v. Astrue*, No. 10 Civ. 4324, 2012 WL 3614323, at *8 (E.D.N.Y. Aug. 21, 2012) (citation omitted)).

The regulations regarding the evaluation of medical evidence were amended for claims filed after March 27, 2017, and several of the prior Social Security Rulings, including SSR 96-2p, have been rescinded.  According to the new regulations, the Commissioner "will no longer give any specific evidentiary weight to medical opinions; this includes giving controlling weight to any medical opinion."  Revisions to Rules

Regarding the Evaluation of Medical Evidence ("Revisions to Rules"), 2017 WL
168819, 82 Fed. Reg. 5844, at 5867-68 (Jan. 18, 2017), see 20 C.F.R. §§ 404.1520c(a),
416.920c(a).  Instead, the Commissioner must consider all medical opinions and
"evaluate their persuasiveness" based on the following five factors: supportability;
consistency; relationship with the claimant; specialization; and "other factors."  20
C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Under the regulations applicable to individuals filing before March 27, 2017, the
ALJ's analysis was subject to the "treating physician rule."  "Although the treating
physician rule generally requires deference to the medical opinion of a claimant's
treating physician, . . . the opinion of the treating physician is not afforded controlling
weight where . . . the treating physician issued opinions that are not consistent with
other substantial evidence in the record . . . ."  *Halloran v. Barnhart*, 362 F.3d 28, 32
(2d Cir. 2004); *Veino v. Barnhart*, 312 F.3d at 588; 20 C.F.R. §§ 404.1527(d)(2),
416.927(d)(2).

For claims filed prior to March 27, 2017, the Social Security Administration
categorized nurse practitioners and physicians' assistants as "other medical sources,"
whose opinion was considered as to the severity of a claimant's impairment and ability
to work, but who were not necessarily entitled to the weight afforded to a treating
physician. 20 C.F.R. §§ 416.913(d)(1), 404.1513(d)(1).[13]  The regulations directed an

---

[13] The current version of these regulations (applicable to cases filed after March 27, 2017) no
longer differentiates between "acceptable" and "other" medical sources.  The sections are entitled
"Categories of Evidence," and define the differences between objective medical evidence, medical
opinion, "other medical evidence," and evidence from non-medical sources.  The evaluation of opinion
evidence for claims filed prior to March 27, 2017 is now located at 20 C.F.R. § 404.1527 and 416.927
and does refer to acceptable versus other sources.

ALJ to use various factors in evaluating the opinions of these "other medical sources," including frequency of treatment, consistency with other evidence, degree of supporting evidence, thoroughness of explanation, and whether the source has an area of expertise. 20 C.F.R. §§ 404.1527(c) and (f), 416.927(c) and (f).[14]   The Second Circuit stated that "'the ALJ has discretion to determine the appropriate weight to accord [the other source's] opinion based on all the evidence before him." *House v. Comm'r of Soc. Sec.*, 32 F. Supp. 3d 138, 151 (N.D.N.Y. 2012) (quoting *Diaz v. Shalala,* 59 F. 3d 307, 313–14 (2d Cir. 1995)) (some alterations in original).

### 3.    Credibility/Consistency

In evaluating a plaintiff's RFC for work in the national economy, the ALJ must take the plaintiff's reports of pain and other symptoms into account. *Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).   The ALJ must "'carefully consider'" all the evidence presented by claimants regarding their symptoms, which fall into seven relevant factors including 'daily activities' and the 'location, duration, frequency, and intensity of [their] pain or other symptoms.'" *Del Carmen Fernandez v. Berryhill*, No. 18-CV-326, 2019 WL 667743, at \*9 (S.D.N.Y. Feb. 19, 2019) (citing 20 C.F.R. § 404.1529(c)(3); Social Security Ruling (SSR) 16-3p, *Titles II and XVI: Evaluation of Symptoms in Disability Claims*, 81 FR 14166-01 at 14169-70, 2016 WL 1020935 (Mar. 16, 2016)).

---

[14] The new regulations now contain separate sections for claims filed prior to, and after, March 27, 2017.  As stated above, sections 404.1527 and 416.927 contain the regulations for cases filed prior to March 27, 2017.  In sections 404.1527(f)(1) and 416.927(f)(1), the regulations refer to 404.1527(c)(1)-(c)(6) and 416.927(c)(1)-(c)(6) which contain the specific factors by which the Commissioner evaluates "acceptable medical sources," but states that "not every factor for weighing opinion evidence will apply in every case because the evaluation of an opinion from a medical source who is not an acceptable medical source or from a nonmedical source depends on the particular facts in each case." *Id.*

In 2016 the Commissioner eliminated the use of term "credibility" from the "sub-regulatory policy" because the regulations themselves do not use that term. SSR 16-3p, 81 FR at 14167.  Instead, symptom evaluation tracks the language of the regulations.[15] The evaluation of symptoms involves a two-step process.  First, the ALJ must determine, based upon the objective medical evidence, whether the medical impairments "could reasonably be expected to produce the pain or other symptoms alleged . . . ."  20 C.F.R. §§ 404.1529(a), (b); 416.929(a), (b).

If so, at the second step, the ALJ must consider "'the extent to which [the claimant's] alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the [objective medical evidence] and other evidence to decide how [the claimant's] symptoms affect [her] ability to work.'" *Barry v. Colvin*, 606 F. App'x 621, 623 (2d Cir. 2015) (citing inter alia 20 C.F.R. § 404.1529(a); *Genier v. Astrue*, 606 F.3d at 49)) (alterations in original).[16]

If the objective medical evidence does not substantiate the claimant's symptoms, the ALJ must consider the other evidence. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013).  The ALJ must assess the claimant's subjective complaints by considering the record in light of the following symptom-related factors: (1) claimant's daily

---

[15] The standard for evaluating subjective symptoms has not changed in the regulations.  Rather, the term "credibility" is no longer used, and SSR 16-3p makes it clear that the evaluation of the claimant's symptoms is not "an evaluation of the claimant's character." 81 FR at 14167.  The court will remain consistent with the terms as used by the Commissioner.

[16] The court in *Barry* also cited SSR 96–7p, 1996 WL 374186, at *2 (July 2, 1996) which was superceded by SSR 16-3p.  As stated above, the factors considered are the same under both rulings.  The 2016 ruling has removed the emphasis on "credibility."

activities; (2) location, duration, frequency, and intensity of claimant's symptoms; (3) precipitating and aggravating factors; (4) type, dosage, effectiveness, and side effects of any medication taken to relieve symptoms; (5) other treatment received to relieve symptoms; (6) any measures taken by the claimant to relieve symptoms; and (7) any other factors concerning claimant's functional limitations and restrictions due to symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

### B.    Analysis

Plaintiff argues that the ALJ erred in failing to assess limitations on work pace and attendance in the RFC, "notwithstanding the fact that every medical opinion to address these issues found at least a 'moderate' impairment." (Pl.'s Br. at 11-21). Plaintiff's impairments include both physical and mental limitations; thus, the ALJ must determine limitations imposed by both types of impairments.

While, as discussed below, there is medical evidence that plaintiff has some "moderate" limitations in mental and physical functioning, the ALJ accepted that plaintiff had limitations.  The plaintiff argues that the ALJ did not impose sufficient limitations on plaintiff's ability to remain on-task or attend work.  However, the ALJ did assess specific limitations to plaintiff's work pace, first, by limiting plaintiff to simple tasks, "not at an assembly line rate."[17] (T. 19).  The "rate" at which plaintiff can

---

[17] The ALJ's opinion supports this court's finding that the ALJ considered plaintiff to be limited in work pace and attendance.  The ALJ stated that "[t]he claimant's variable energy levels support a limitation in attention, concentration, and performing activities within a schedule." (T. 24). Thus, the ALJ clearly took these limitations into account in establishing the plaintiff's RFC. However, he found that "additional limitations are not supported by the record," and that "the record as a whole supports the conclusion that she can perform work within the [RFC] noted above." (*Id.*)  The court must determine whether that particular finding was supported by substantial evidence.

perform tasks is an explicit reference to work pace.

The only jobs proposed by the VE and included in the ALJ's decision were "unskilled" based on the ALJ's hypothetical. (T. 26, 103).  A moderate limitation in work related functioning does not prevent, a plaintiff from performing unskilled work. *Shawn V. v. Comm'r of Soc. Sec.*, No. 1:20-CV-0997 (WBC), 2021 WL 3022295, at *4 (W.D.N.Y. July 16, 2021) (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)). In addition, the ALJ's RFC, expressed in his hypothetical to the VE, allowed for plaintiff to sit at her work station for 10 minutes after 30 minutes of standing or walking, and allowed her "ready"[18] access to a bathroom. (T. 19).  All of these additional limitations are relevant to plaintiff's work pace and take both her physical and mental limitations into account.[19]

Even if the ALJ had failed to include an *explicit* reference to work pace, it has been held that such an error is harmless as long as

> (1) '[the] medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace,' and the challenged hypothetical is limited 'to include only unskilled work'; or (2) the hypothetical 'otherwise implicitly account[ed] for a claimant's limitations in concentration, persistence, and pace[.]'

*McIntyre v. Colvin*, 758 F.3d 146, 152 (2d Cir. 2014).  In this case, the ALJ's

---

[18] "Ready" in this context is defined as "immediately available." https://www.merriam-webster.com/dictionary/ready.

[19] Plaintiff correctly argues that the medical reports do not support a decision not to include ***any*** work pace or attendance limitations. (Pl.'s Br. at 12-13).  However, plaintiff's argument does not support her claim because the ALJ did include limitations on work pace in his RFC.

hypothetical took into account all of the limitations in work pace that the ALJ found were supported by the evidence of record, including the limitation to unskilled work.

Defendant argues that Dr. Susarla's physical RFC report supports the ALJ's finding that plaintiff could perform light work, notwithstanding her impairments, pain, and limitations. (Def.'s Br. at 4-5).  Dr. Susarla was a state agency consultant who reviewed the record, including plaintiff's gastroenterology records. (T. 117-19). Plaintiff argues that the defendant cannot rely on Dr. Susarla's report because the ALJ did not credit Dr. Susarla's opinion that plaintiff had "no limitations to staying on task or maintaining attendance." (Pl.'s Reply Br. at 2-3).

While plaintiff's statement is correct about the basis for the ALJ's opinion, the court notes that, while Dr. Susarla found that plaintiff could engage in light work, with few limitations, the ALJ added limitations based upon plaintiff's mental and physical impairments. *See Burt v. Comm'r of Soc. Sec*., No. 18-CV-1252, 2020 WL 1467265, *5 (W.D.N.Y. 2020) ("[t]he ALJ was performing her duty by using [the consultative examiner's opinion] and observations when formulating the RFC despite [the examiner's] opinion lacking explicit limitations on some exertional abilities").  The ALJ added the sit-stand option to his RFC, which specifically relates to plaintiff's ability to stay on task and/or her work pace. (T. 22).  The ALJ did not "rely" on Dr. Susarla to determine that there were no limitations on plaintiff, because the ALJ found that there were limitations on plaintiff's abilities.  However, Dr. Susarla's opinion supports the ALJ's determination because the ALJ added restrictions favorable to

plaintiff based on additional evidence in the record.[20]

The ALJ also discussed state agency psychologist, Dr. L. Haus, Psy. D., who found that plaintiff could perform unskilled work, notwithstanding her mental impairments and several "moderate" limitations in work capacity, including a moderate limitation in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. (T. 22, 119-21). Plaintiff argues that limiting plaintiff to unskilled or simple work does not account for limitations on staying on task and attendance. (Pl.'s Reply Br. at 4).

RFC is defined as the ability to perform physical or mental work activities on a *sustained basis* notwithstanding limitations for the collective impairments. *Marcano v. Comm'r of Soc. Sec.*, No. 20-CV-4230 (JPO/RWL), 2021 WL 5315703, at *3 (S.D.N.Y. Nov. 16, 2021), *report and recommendation adopted*, No. 20-CV-4230 (JPO), 2022 WL 253083 (S.D.N.Y. Jan. 26, 2022) (emphasis added); *Shelley v. Comm'r of Soc. Sec.*, No. 1:18-CV-697-DB, 2019 WL 4805023, at *2 (W.D.N.Y. Oct. 1, 2019) (citing 20 C.F.R. § 404.1520(e)-(f)). As defendant argues, state agency experts are instructed to assess the plaintiff's work-related functions "on a sustained basis," which includes the ability to work an eight-hour day for a five-day week. (Def.'s Br. at 9-10) (citing Program Operations Manual System ("POMS") §§ DI 24510.001A.3.a, DI 24510.004C.2.b, DI 24510.050; see also POMS DI § 24510.006 (directing state agency

---

[20] Plaintiff also argues that Dr. Susarla did not explain his findings and wrote only "gastrointestinal issues, abdominal pain" in his report. (Pl.'s Reply Br. at 3) (citing T. 118). Although plaintiff's citation is correct, Dr. Susarla's explanation appears further down the page, at T. 118-19, under the title "RFC - Additional Explanation." It is in this paragraph that Dr. Susarla cites to the findings of the consultative examiner upon which Dr. Susarla relied in part for his RFC, and he refers to plaintiff's records from Massachusetts General Hospital, Lourdes, and UHS.

physicians to follow Social Security Ruling ("SSR") 96-8p); SSR 96-8p, 1996 WL 274184, at *1 (July 2, 1996) (defining work on a *regular and continuing basis as eight hours per day, five days per week*)).

Plaintiff argues that the court cannot "assume" that the state agency consultants complied with the POMS in making their decisions because the POMS are not binding. However, Magistrate Judge Peebles has held that, based on these specific POMS sections, and cases interpreting them, "you can infer that those state agency consultants concluded plaintiff is able to perform on a sustained basis and meet a schedule." *Ana C.M. v. Kijakasi*, No. 3:20-CV-296 (DEP), Slip op. at 14 (N.D.N.Y. July 23, 2021).  An ALJ may consider and give weight to non-examining state agency medical consultants. *See Frye ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record.").  Thus, and as further discussed below, the ALJ did not err when considering Dr. Susarla's and Dr. Haus's RFC evaluations.

This case is distinguishable from *Robinson v. Comm'r of Soc. Sec.*, No. 21-186-CV, 2022 WL 761132 (2d Cir. Mar. 14, 2022), which was decided under the pre-2017 regulations, and in which the court found that the ALJ erred in giving less weight to the treating physician's opinion that plaintiff would miss work two to three times each month on average due to his impairments. *Id.* at *2.  In *Robinson*, the court stated that "because Dr. Duvalsaint's opinions regarding the number of times per month Robinson would miss work and his sitting endurance are 'supported by reliable medical

techniques and [ ] *not contradicted by other reasonable evidence in the administrative record*,' we conclude that 'the ALJ traversed the substance of the treating physician rule' when it found that Dr. Duvalsaint's opinions were entitled to less weight under these circumstances . . . ." *Id.* (quoting *Colgan v. Kijakasi*, 22 F.4th 353, 360 (2d Cir. 2022) and citing *Estrella v. Berryhill*, 925 F.3d 90, 98 (2d Cir. 2019)) (emphasis added)).  In this case, the restrictive opinions of off-task and absentee behavior are contradicted, and the ALJ discussed his reasons for finding them less persuasive.

Plaintiff argues that the opinions of her off-task and absentee behavior are not contradicted in the administrative record.  Plaintiff argues that "Questionnaires" submitted by plaintiff's treating gastroenterologist, Viaicu A. Botoman, M.D., plaintiff's treating social worker, Stefanie Pickens, LCSW, together with the opinion of consultative psychologist, Dr. Amanda Slowik, Psy.D.[21] support plaintiff's claim that the ALJ should have included additional limitations on work pace and attendance in the RFC for both physical and mental limitations.

Dr. Botoman submitted three "Questionnaires," the first dated October 3, 2018, the second dated August 15, 2019, and the third dated September 26, 2019. (T. 516, 562, 747).  In the first Questionnaire, Dr. Botoman checked a box, stating that plaintiff would require unlimited access to the bathroom which could not be accommodated by a break in the morning, a break in the afternoon, and a break for lunch. (T. 516).  The need to use the bathroom would be urgent and immediate. (*Id.*)  Plaintiff's work pace would be diminished, and she would need to "rest" at work. (T. 517).  Dr. Botoman also

_____

[21] Dr. Slowik did not complete a Questionnaire.  Her medical source statement is contained in her consultative expert opinion. (T. 457-58).

opined that the combination of plaintiff's impairments would cause plaintiff to be "off-task" more than 15%, but less than 20% of the workday, and she would be absent from work three days per month. (T. 517, 699).[22]

On August 15, 2019, Dr. Botoman submitted a document that he entitled "Addendum to Questionnaire." (T. 562).  Dr. Botoman wrote that plaintiff's GI symptoms had decreased at her May 9, 2019 appointment, her condition had improved, and her limitations were limitations "less severe." (*Id.*)  Dr. Botoman then checked a box indicating that plaintiff would not need unlimited access to a bathroom, and that her need for a bathroom could be accommodated during regular work breaks. (*Id.*)  There was no specific opinion regarding work pace, need to rest, or plaintiff being "off-task" or absent.  In fact, the document consisted only of one page, including the new information.

At the hearing, plaintiff's counsel stated that when he shared Dr. Botoman's August 2019 Questionnaire with his client, she was "surprised" by the updated Questionnaire. (T. 62).  So they recontacted Dr. Botoman to provide "more detail." (*Id.*)  As a result, Dr. Botoman submitted a new Questionnaire, dated September 26, 2019, which was very similar to the October, 2018 document. (T. 746-47).  The first page was slightly different.  In the first paragraph, Dr. Botoman checked a box, indicating that plaintiff would require unlimited access to the bathroom. (T. 746).  However, in the next paragraph, he checked the box indicating that plaintiff's need for the bathroom could be accommodated during regular work breaks. (*Id.*)  In the next paragraph, he

---

[22] The second page of the October 2018 Questionnaire was also included in another exhibit, which also contained Dr. Botoman's contemporaneous examination notes. (T. 695-710).

checked the box relating to urgency, and indicated that plaintiff's limitation could not be accommodated during regular work breaks. (*Id.*)  Dr. Botoman included a second page with the same off-task and absentee information that he had in his October 3, 2018 Questionnaire. (T. 747).

The ALJ found the October 2018 and the September 26, 2019 Questionnaires "unpersuasive" because Dr. Botoman's opinion of off-task behavior and absenteeism was "not consistent with the record."[23] (T. 23).  The ALJ stated that, even though plaintiff's symptoms supported the postural limitations that the ALJ included in the RFC, the record did not support that the plaintiff would be off-task 15-20% of the day or be absent 3 days per month. (*Id.*)  The ALJ found that the intensity and persistence of plaintiff's symptoms were not fully supported by Dr. Botoman's treatment notes. (*Id.*)

Instead, the ALJ found that Dr. Botoman's August 2019 Questionnaire was "somewhat persuasive," because it was generally consistent with the record, which showed that plaintiff was slowly improving, and that plaintiff's gastroparesis and constipation were "stable." (T. 23).  The ALJ resolved the conflict in Dr. Botoman's Questionnaires, based on a review of the doctor's treatment notes.  Dr. Botoman's last treatment note was dated May 9, 2019, and was the specific basis for his submission of the August 2019 Addendum. (T. 562, 695).  The May 2019 treatment note states that plaintiff was being seen for a follow-up for her gastroparesis. (T. 695).  Dr. Botoman stated that plaintiff was being evaluated for EDS by a geneticist in Rochester, New

---

[23] In accordance with SSR 16-3p, the ALJ performed a consistency analysis, finding that "the claimant's statement concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision." (T. 20).  Plaintiff does not specifically challenge this finding.

York.[24]  Dr. Botoman's note stated that, even though plaintiff still complained of gastric

pain, she had decreased her use of  marijuana,[25] and her vomiting episodes decreased,

noting that she was last seen in November of 2018 by Nurse Practitioner ("NP")

Elizabeth Glennon from Dr. Botoman's office. (*Id.*)  The "interval history" from the

November 5, 2018 examination is also included in the May, 2019 report.[26] (T. 695-96).

In May of 2019, plaintiff continued to report many symptoms. (T. 697).

However, Dr. Botoman's physical examination found her abdomen to be flat, non-

distended, soft, with bowel sounds positive throughout. (*Id.*)  He found mild,

generalized tenderness, without rebound tenderness, guarding, grimacing, or palpable

masses. (*Id.*)  Plaintiff also reported *no* anxiety or depression. (*Id.*)  There are no

subsequent medical reports in the record by Dr. Botoman after May 5, 2019 and after

his August of 2019 Addendum, until the September 2019 Questionnaire.

The ALJ considered the conflicting evidence and found that Dr. Botoman's

September 26, 2019 Questionnaire was "unpersuasive." (T. 23).  It was inconsistent

---

[24] Dr. Botoman works at Massachusetts General Hospital in Boston. (T. 695).

[25] Plaintiff was using the marijuana to increase her appetite, but Dr. Botoman believed that it could be making the nausea worse. (*See* T. 697 - "Am glad that you decreased the marijuana, its [sic] decreased the nausea.")

[26] The November 2018 "interval history" states that plaintiff was "stable," and her greatest concern was constipation. (T. 713).  Plaintiff still had symptoms, having urge incontinence or passive leakage a few times per month.  Bloating with distention were associated with the constipation, and were still "significant." (*Id.*)  It is unclear whether the next page of the report is still from November of 2018 or was the May 9, 2019 report.  However, it states that plaintiff's gastroparesis was "stable." (T. 714).  Plaintiff's nausea was worse in the morning, but less severe than historically. (*Id.*)  She had occasional stabbing, fleeting epigastric pain. (*Id.*)  Her heartburn was improved because she avoided high fat foods. (*Id.*)  The only abnormal finding in the May 9, 2019 examination was mild generalized tenderness with palpation. (T. 717).  Dr. Botoman recommended "pelvic floor PT" for her constipation. (*Id.*)

with his August 2019 report and does not appear to be based on a contemporaneous examination of the plaintiff, while the August 2019 Addendum Questionnaire specifically refers to plaintiff's improvement in May of 2019.[27]  Her improvement was consistent with the medical reports showing that plaintiff's condition slowly began to improve and stabilize, and consistent with medical examinations finding normal bowel sounds, a non-distended abdomen, and mild tenderness on palpation. (T. 23) (citing (T. 354 - 7/12/17, 583 - 8/29/18).[28]  The ALJ also found that a March 2017 endoscopy and colonoscopy and an October 2018 endoscopy were normal.[29] (T. 20-21, 341, 444, 447, 566). Thus, the ALJ's failure to incorporate Dr. Botoman's September 2019 off-task and absentee opinion into the RFC is supported by substantial evidence.

As stated above, in determining the plaintiff's RFC, the ALJ also considered the

---

[27] Plaintiff does not mention the August 2019 Questionnaire in her discussion of Dr. Botoman's reports. (Pl.'s Br. at 14-15).

[28] Other examinations showing normal bowel sounds, mild abdominal tenderness, and a non-distended abdomen include the following: (T. 353, 355, 358, 361, 364 (moderate tenderness, but non-distended abdomen), 376 (non-tender abdomen), 380 (non-tender abdomen), 386, 403 (non-tender abdomen), 441, 463 (mild/moderate tenderness, but flat and non-distended), 582, 594 (generalized tenderness), 601 (normal exam-no tenderness noted), 697 (Dr. Botoman's May 2019 examination), 701 (NP Glennon November 2018 examination), 710).

[29] Plaintiff argues that the tests were not all normal, and again, she is certainly correct. Plaintiff's October 2018 esophagogastroduodenoscopy ("EGD") (an endoscopic procedure that examines the esophagus, stomach and duodenum), showed a normal esophagus, but also showed erythmatous mucosa in the stomach and granular mucosa in the second and third portion of the duodenum.  However, the biopsies of these two areas were ultimately normal. (T. 700, 714-15). Plaintiff also had an anorectal manometry in 2017 which showed an outlet obstruction. (T. 700).  And her gastroparesis was diagnosed with a gastric emptying test.  The ALJ clearly found that plaintiff had severe impairments.  His discussion of "normal" testing did not imply that plaintiff's tests were all normal. In addition, as defendant points out, some of the medical records that plaintiff cites were submitted to the Appeals Council and were never seen by the ALJ. (Pl.'s Br. at 16, 17-18) (citing T. 36, 37, 40, 42, 53, 55).  As stated above, there is no claim that the Appeals Council erred in finding that the additional evidence would not have changed the ALJ's opinion.

June 11, 2018 opinion of non-examining state agency consultant, Dr. A. Susarla, M.D. (T. 22, 118-19).  Dr. Susarla found that plaintiff could perform light work, with some additional postural limitations. (*Id.*)  In doing so, Dr. Susarla considered, among others, the consultative examination written by Dr. Gilbert Jenouri, M.D., who found that plaintiff had mild physical restrictions.[30] (T. 118-19, 505).  The ALJ considered both of these opinions, but found Dr. Jenouri's opinion "vague."[31] (T. 23).  He found that Dr. Jenouri's opinion was "generally consistent with the record, but found it only "partially persuasive." (*Id.*) The ALJ also found Dr. Susarla's opinion partially persuasive, finding that plaintiff's weakness supported additional limitations in climbing ropes, ladders or scaffolds.  Her gastrointestinal symptoms, including abdominal discomfort, required a "sit-stand" option. (T. 22).  The ALJ added the requirement of ready access to a bathroom and the 10 minute rest periods to the RFC based on the totality of the record. (T. 24).

Plaintiff also argues that the "Mental Questionnaire," written by LCSW Pickens is "contrary to, and cannot constitute substantial evidence in support of, the ALJ's failure to include any limitations to work pace and/or attendance." (Pl.'s Br. at 17). First, as stated above, the ALJ did consider plaintiff's limitations on work pace and attendance, but found that the record as a whole supported his ultimate RFC.  In any event, the ALJ discussed the Mental Questionnaire written by LCSW Pickens, first

---

[30] Dr. Jenouri's abdominal examination found normal bowel sounds and a soft abdomen, with bilateral lower quadrant tenderness to palpation, but no hepatosplenomegaly (a disorder where both the liver and spleen swell beyond their normal size), no masses, or abdominal bruits. (T. 503).

[31] In fact, the ALJ did not even mention Dr. Jenouri by name, referring to him only as "[a] medical source." (T. 23).

stating that Ms. Pickens is not an acceptable medical source under the regulations.[32] (T. 23-24).  However, the ALJ then analyzed the report for persuasiveness in accordance with the post-2017 regulations. (*Id.*)

On September 25, 2019, Ms. Pickens stated that plaintiff had more than a slight limitation in maintaining attention and concentration, a "'medium'" limitation in maintaining regular attendance and a marked limitation in performing activities within a schedule."[33] (T. 607-608).  Ms. Pickens concluded that plaintiff would be off-task between 20-30% in a workday and would be absent three or more days per month. (T. 608).  The ALJ found that Ms. Pickens Questionnaire was "partially consistent" with the record, with respect to certain limitations in attention, concentration, and performing activities within a schedule, "but not to a marked degree." (T. 24).  The ALJ stated that plaintiff was alert, oriented, and had proper behavior during Ms. Pickens's counseling sessions. (*Id.*)

The ALJ's determination is supported by the record and by Ms. Pickens's own treatment records.  From January 11, 2019 until September 13, 2019, Ms. Pickens rated plaintiff's attention and concentration as "intact." (*See* T. 613, 619, 623-24, 627-28,

---

[32] Social workers were considered nonmedical sources both before and after the 2017 amendments, and the ALJ is not required "to articulate how [he] considered evidence from nonmedical sources using the requirements in paragraphs (a)-(c) in this section." 20 C.F.R. § 404.1520c(d). *See Gina D. v. Comm'r of Soc. Sec.*, No. 6:20-CV-6878, 2021 WL 4748436, at *4 (W.D.N.Y. Oct. 12, 2021).

[33] Ms. Pickens also checked boxes indicating that plaintiff had a more than slight limitation in her ability to interact appropriately with the general public, accept instructions, and respond appropriately to criticism from supervisors, but had no limitation in her ability to get along with co-workers. (T. 607).  Plaintiff had a "medium" limitation in her ability to respond to ordinary stressors in a work setting with simple tasks. (*Id.*)

632, 636, 640, 644-45).  During the same time period, Ms. Pickens rated plaintiff's depression and anxiety as "mild." (T. 630, 634, 636, 638, 644-45).

As stated above, the ALJ also considered Dr. L. Haus's opinion, finding it persuasive. (T. 22).  Dr. Haus reviewed the record and determined, inter alia, that plaintiff would have a "moderate" limitation in the "ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances." (T. 119-20).  "[H]aving a moderate limitation in a mental functional area does not rule out a claimant's ability to do basic work activities." *Edward S. v. Comm'r*, No. 5:20-CV-1550 (TWD), 2022 WL 846315, at *8-9 (N.D.N.Y. Mar. 22, 2022) (citing *Zabala v. Astrue*, 595 F.3d 402, 410 (2d Cir. 2010)). *See also Melissa L. v. Comm'r of Soc. Sec.*, No. 6:20-CV-6667 (EAW), 2022 WL 593452, at *6 (W.D.N.Y. Feb. 28, 2022) (citing cases).

Plaintiff was also treated by psychiatrist, Dr. Albert Wolkoff, M.D. (T. 413-35 (5/7/17-12/28/17), 536-59 (1/10/18-5/24/19)).  On May 24, 2019, Dr. Wolkoff rated plaintiff's energy as "fair," her mood was "sad" because she had a bad reaction to some new medication, but her affect was full-range, and her mental examination, including memory, attention, concentration, judgment, and insight were all "intact." (T. 536-37). Dr. Wolkoff's other examination findings from January 2018 to May 2019 were similar. Plaintiff's energy varied, as did her appetite and mood, but her mental examinations were consistently normal. (T. 538-39, 540-41, 542-43, 544-45, 546-47, 548-49, 550-51, 552-53, 554-55, 556-57, 558-59).

Dr. Wolkoff's initial interview with plaintiff in May of 2017 showed some more

severe symptoms, including some suicidal ideation, without plan. (T. 434-35).

However, during the same examination, plaintiff stated that her energy was "great," and

her mood "a little nervous," and her depression was "off and on," but Dr. Wolkoff

found plaintiff's memory intact. (*Id.*)  He noted plaintiff's visits to the emergency room

for nausea and vomiting. (*Id.*)  In July of 2017, Dr. Wolkoff noted that plaintiff's mood

was stable and her affect full-range, even though her energy was variable, she had

racing thoughts, and still contemplated suicide without any plan. (*Id.*)  Her judgment,

memory, attention, and concentration were all normal. (T. 431).

   In September of 2017, plaintiff was stressed about her upcoming wedding, her

appetite was still down, but her affect was full-range, and her judgment, memory,

attention, and concentration were all intact. (T. 423-24).  In October, Dr. Wolkoff noted

that plaintiff got married "on Saturday," and although there was no change in her

appetite and her energy was "variable," her mood was good, her affect was full-range,

and she had less vomiting with Xanax. (T. 421).  Dr. Wolkoff also found that plaintiff

had no more suicidal ideation, and her memory, attention, concentration, judgment and

insight were all intact. (T. 421-22).  On October 25, 2017, Dr. Wolkoff stated that

plaintiff's mood was "pretty level," her energy was "good," her affect was full-range,

and her judgment, insight, memory, attention, and concentration were all intact.[34] (T.

419-20).  The same findings regarding judgment, insight, memory, attention, and

concentration were made in November and December of 2018. (T. 413-14, 416, 418).

   Although consultative psychologist Dr. Slowik found that plaintiff would have a

---

   [34] Dr. Wolkoff did note that there was "no change" in plaintiff's condition, notwithstanding the
improvement in some of her symptoms. (T. 420).

"moderate to marked" limitation in sustaining an ordinary routine and regulating her emotions, (T. 458), the ALJ found that plaintiff would not have such limitations to a "marked degree."  Plaintiff argues that the ALJ only rejected Dr. Slowik's opinion that plaintiff's "adaptation" would be limited to a marked degree, but not her opinion that plaintiff had a "marked" limitation in "sustaining an ordinary routine." (Pl.'s Reply Br. at 1-2).  The ALJ stated that:

> In terms of consistency, Dr. Slowik's opinion is generally consistent with the record's documentation of the claimants [sic] complaints of abnormal mood and affect, reported crying spells, and variable energy levels, and supports limitations in sustained concentration and persistence, social interaction, and adaptation; however, the record regarding these symptoms does not support greater than a moderate limitation in adaptation.

(T. 22-23).

Clearly, based on the rest of the ALJ's decision, the ALJ did not accept Dr. Slowik's determination that plaintiff's had a "marked" limitation in her ability to sustain an ordinary routine. *See* (T. 24).  When the ALJ was discussing Ms. Pickens's questionnaire, he accepted portions of it, finding that, in terms of consistency with the record, "[t]he claimant's variable energy levels support a limitation in attention, concentration, and performing activities within a schedule, *but not to a marked degree*." (T. 24).

Thus, while there is no question that plaintiff suffers from limitations due to her mental condition, the ALJ properly determined that Ms. Pickens's questionnaire was only partially consistent with the record, and this court finds that Dr. Wolkoff's treatment notes further support the ALJ determination.  The ALJ's discussion shows

that he took plaintiff's limitations in work pace and attendance into account when formulating the RFC. (T. 24). The ALJ specifically cited plaintiff's abdominal tenderness and waves of nausea supporting the physical limitations cited in the RFC, including the finding that plaintiff must have ready access to the bathroom at the work site and the ability to have a "sit/stand" option. (*Id.*) The ALJ considered plaintiff's mental impairments and her variable energy level in determining her work pace and attendance limitations. However, the ALJ determined that greater limitations were not warranted based on the medical evidence showing that plaintiff had "numerous" abdominal examinations showing no distention, no masses, rigidity, guarding, or rebound. (T. 24).

Although there may be evidence in the record that would support a contrary RFC determination, it is not for this court to reweigh the evidence. *Rivera v. Comm'r of Soc. Sec.*, 368 F. Supp. 3d 626, 642 (S.D.N.Y. 2019). "[O]nce an ALJ finds facts, [the Court] can reject those facts only if a reasonable factfinder would have to conclude otherwise." *Brault*, 683 F.3d at 448 (internal citation omitted). In this case, the ALJ resolved conflicting evidence and made his RFC determination based on the totality of the record. The court finds that the ALJ's determination is supported by substantial evidence.

**WHEREFORE**, based on the findings above, it is

**ORDERED**, that the decision of the Commissioner is **AFFIRMED**, and plaintiff's complaint is **DISMISSED**, and it is

**ORDERED**, that the Clerk enter judgment for the **DEFENDANT**.

Dated: March 29, 2022

Andrew T. Baxter
U.S. Magistrate Judge